972 F.2d 1230
 61 USLW 2203, 7 IER Cases 1289
 Willie E. SIMS, Jr., Individually and in his capacity as a
Minister of the Gospel and as a classified
employee of Metropolitan Dade County,
Florida, Plaintiff-Appellee,
v.
METROPOLITAN DADE COUNTY, Defendant,
Joaquin Avino, Individually and as County Manager, Ari Sosa,
Individually and as Director of the Department of Community
Affairs and Lloyd Major, Individually and as Assistant
Director of the Department of Community Affairs,
Defendants-Appellants.
 No. 91-5932.
 United States Court of Appeals,
Eleventh Circuit.
 Sept. 18, 1992.
 
 Lee Kraftchick, Asst. Co. Atty., Miami, Fla., for defendants-appellants.
 Jesse J. McCrary, Jr., McCrary & Dove, Miami, Fla., for plaintiff-appellee.
 Mark King Leban, Miami, Fla., amicus-ACLU of Florida.
 Appeal from the United States District Court for the Southern District of Florida.
 Before KRAVITCH and HATCHETT, Circuit Judges, and BROWN*, Senior Circuit Judge.
 BROWN, Senior Circuit Judge:
 
 
 1
 Willie Sims filed this action pursuant to 42 U.S.C. § 1983 alleging that he was unlawfully suspended from government employment for exercising his First Amendment rights. He sued his employer, Metropolitan Dade County, and three supervisory employees of Dade County, Joaquin Avino, Ari Sosa, and Lloyd Major, in their individual and official capacities. Avino, Sosa, and Major, exclusively in their individual capacities, moved for summary judgment based on qualified immunity. The district court denied the motion without prejudice to the Defendants' right to reassert the defense at trial. Avino, Sosa, and Major now appeal, in their individual capacities, from the district court's denial of their motion for summary judgment. For the following reasons, we reverse the order of the district court and remand for resolution of the remaining claims asserted by Sims.
 
 I. FACTS
 
 2
 Willie Sims is a Black man who, for more than ten years, has worked for the Dade County Department of Community Affairs (the "Department"), which serves the Greater Miami, Florida area. The Department's function is to foster mutual understanding and tolerance among all of Miami's ethnic groups. As a former member and coordinator of the Department's Crisis Prevention and Response Team, and as a current member of the Department's Office of Black Affairs, Sims' position requires that he investigate concerns of the Miami community's various ethnic groups and attempt to ease the tensions among such groups. His job requires that he work to promote harmonious community relations.
 
 
 3
 During 1984, Sims became a preacher. By 1989, he had become a pastor, and he currently serves in that capacity for the Greater New Faith Missionary Baptist Church. In his capacity as pastor, Sims ministers to the spiritual and, he alleges, the secular needs of his congregation. During his sermons, he sometimes comments upon current nonreligious issues of concern to his parishioners and to members of the Black community in general. In his capacity as a pastor and a citizen, Sims occasionally has made remarks that his supervisors at the Department felt were inappropriate in view of his position with the Department.
 
 
 4
 During July of 1988, Dr. Aristides Sosa, Sims' superior in the Department, counseled Sims after Sims publicly complained about what he perceived to be the Metro-Dade Police Department's racially discriminatory practices. In the early part of the summer of 1990, racial tensions mounted in Miami after the perceived snubbing of Nelson Mandela during his visit to the United States. At a community meeting called to discuss the situation, Miami Mayor Xavier Suarez indicated that Mandela was not honored with a key to Miami because of Mandela's support for Fidel Castro. Upon hearing this, Sims called Mayor Suarez an "idiot," a description he later repeated on the radio. Sosa again counseled Sims for his contentious remarks.
 
 
 5
 After the Mandela incident and in reaction thereto, segments of the Black community commenced a boycott. Sims made the statements that gave rise to this action during a December 16, 1990 sermon. Sims contends that he made the following remarks while discussing the boycott:
 
 
 6
 We are now entering the second phase of the boycott known as "Rediscovering Black Miami." You should not spend your money with any business that does not hire Blacks or who have [sic] not shown any sensitivity toward us in the past and you should support Black businesses or those who have a history of hiring Blacks. Sometimes we are made to feel like foreigners in our own homeland because of the way Spanish is spoken in many of our public facilities and businesses, such as restaurants, that we frequent.
 
 
 7
 The Defendants contend that Sims said he felt like a "foreigner in my own land," that he was "frustrated at having to speak Spanish in Miami, especially in restaurants," and that it was time for Blacks to stop doing business with White and Hispanic establishments.
 
 
 8
 Sims' statements, as reported in Spanish in the El Nuevo Herald,[1] infuriated members of the Hispanic community. County Manager Joaquin Avino directed Sosa to conduct an investigation of Sims' comments and to take disciplinary action if appropriate. Sims, Sosa, and Lloyd Major, Assistant Director of the Department of Community Affairs, met and discussed the statements. Sims contended that the Department had no right to control what he said from his pulpit. As he later told reporters, "I'm appalled that in America we would question what a clergyman would say from his pulpit.... [I]n my pulpit ... I'm large and I'm in charge." Noting that Sims previously had been counseled to control his off-duty speech, Sosa and Major imposed a three-day suspension, without pay, for the remarks. They also offered to help Sims obtain a transfer to another County position that would not limit his speech, but Sims declined the offer.
 
 
 9
 In response to the three-day suspension, Sims brought this action under 42 U.S.C. § 1983. He alleged that his suspension, for comments made while he was off-duty and in the pulpit, violated his rights to freedom of speech and religion under the First and Fourteenth Amendments.[2] After taking Sims' deposition, Avino, Sosa, and Major, in their individual capacities, moved for summary judgment based on qualified immunity. The district court, without elaboration, denied the motion, "without prejudice to the individual Defendants' right to reassert a defense of qualified immunity at the trial of this cause." Avino, Sosa, and Major brought this appeal.
 
 II. DISCUSSION
 
 10
 The Defendants appeal from an order denying a motion for summary judgment based on qualified immunity. To the extent that an order denying summary judgment based on qualified immunity turns on an issue of law, it is an appealable order. See Mitchell v. Forsyth, 472 U.S. 511, 530, 105 S.Ct. 2806, 2817-18, 86 L.Ed.2d 411, 427 (1985). Because our jurisdiction over such an order is limited to issues of law, we review de novo. See Hutton v. Strickland, 919 F.2d 1531, 1536 (11th Cir.1990).
 
 A.
 
 11
 As noted supra, the district court denied the Defendants' motion for summary judgment "without prejudice to the individual Defendants' right to reassert a defense of qualified immunity at the trial of this cause." Both sides contend that the court's ruling constituted error, although they dispute the appropriate remedial measures.
 
 
 12
 The Defendants point out that, by denying their motion without prejudice, the district court failed to resolve the qualified immunity issue prior to trial. They contend that the qualified immunity defense should provide them with more than a defense against monetary liability; it should shield them from the burdens of pretrial preparation and trial. The district court, they point out, effectively deferred its ruling upon the issue until trial. At a minimum, they conclude, we should remand the case to the district court for a resolution of the qualified immunity issue prior to the completion of pretrial discovery and trial.
 
 
 13
 Sims responds that the district court, in effect, made a final ruling on the motion for summary judgment. The district court's error, he contends, lies in its "suggestion" that the Defendants may reassert the defense, based on the record, at trial. Sims contends, therefore, that the "without prejudice" language should be ignored because, under established law, the Defendants cannot do what the ruling apparently would allow them to do.
 
 
 14
 The American Civil Liberties Union ("A.C.L.U."), as amicus curiae, contends that the district court may properly deny, without prejudice, a motion for summary judgment based on qualified immunity. It concludes that this court should proceed to the merits of the First Amendment issue.
 
 
 15
 Qualified immunity is an immunity from suit and is effectively lost if a case is erroneously permitted to go to trial. See Mitchell, 472 U.S. at 526, 105 S.Ct. at 2815-16. The denial of a motion for summary judgment based on qualified immunity implies one of two possible conclusions: (1) taking the official's version of the facts as true, the district court concluded that the official's actions violated clearly established law; or (2) assuming the plaintiff's version of the facts to be true, the district court concluded that the official's alleged actions violated clearly established law. See Ansley v. Heinrich, 925 F.2d 1339, 1348 (11th Cir.1991).
 
 
 16
 Under the first conclusion, nothing in the subsequent course of the district court's proceedings could alter its holding. Under the second conclusion, however, unresolved factual issues may prevent the early disposition of the defense. Thus, under the second conclusion, a district court may be forced to deny a pretrial motion for summary judgment and decide the issue on a motion for directed verdict. Cf. Warren v. Dwyer, 906 F.2d 70, 76 (2d Cir.), cert. denied, --- U.S. ----, 111 S.Ct. 431, 112 L.Ed.2d 414 (1990). In such a situation, it would be appropriate to deny a motion for summary judgment "without prejudice."
 
 
 17
 This court previously has noted that qualified immunity presents a question of law for the court to decide, preferably on pretrial motions. See Ansley, 925 F.2d at 1348. It also has noted that the issue should not be submitted to the jury. See id. None of these admonitions, however, are inconsistent with the district court's action in this case. Implicit in the district court's order is a conclusion that, although Sims' allegations suffice to survive a motion for summary judgment, he may be unable to adduce sufficient evidence to survive a motion for a directed verdict based on qualified immunity.
 
 
 18
 This court concludes that, if the district court had been correct in denying the Defendants' motion for summary judgment, it would not have been error to allow the Defendants to reassert the qualified immunity contention during the trial.
 
 B.
 
 19
 Before we determine whether the First Amendment prohibits the Department's punishment of Sims, we must address Sims' contention that several genuine issues of material fact render summary judgment based on qualified immunity inappropriate. See Rich v. Dollar, 841 F.2d 1558, 1562 (11th Cir.1988) (one who claims qualified immunity must establish that no genuine issues of material fact exist). We address each issue individually.
 
 1. The Content of Sims' Statement
 
 20
 As noted supra, there is some dispute over the exact wording of Sims' December 16, 1990 remarks. The Defendants note that a newspaper reported Sims to have said that he felt like a "foreigner in my own land," that he was "frustrated at having to speak Spanish in Miami, especially in restaurants," and that it was time for black citizens to stop doing business with white and Hispanic establishments. The Defendants contend that what Sims alleges he said, or even what he in fact said, is not determinative. They contend that the version of Sims' comments that appeared in the media controls because the media provided the defendants with their initial impressions of Sims' comments.
 
 
 21
 Regardless of what Sims said, or what he contends he said, it is undisputed that the Defendants based their decision on the El Nuevo Herald version of his statements. The relevant question then, for purposes of this litigation, is neither what Sims says he said nor what he in fact said. The relevant question is whether reasonable persons in the Defendants' positions could have believed that their action did not violate clearly established law. See Harlow v. Fitzgerald, 457 U.S. 800, 816-18, 102 S.Ct. 2727, 2737-38, 73 L.Ed.2d 396, 409-11 (1982).
 
 
 22
 The Defendants became aware of Sims remarks when they received complaints. Upon further investigation, they learned that Sims contended that he was misquoted and that his remarks were slightly different from the version reported in the El Nuevo Herald. Sims admitted that he said "sometimes we are made to feel like foreigners in our own homeland because of the way Spanish is spoken in many of our public facilities and businesses, such as restaurants, that we frequent." Rejecting Sims' version and accepting the El Nuevo Herald version of Sims' comments, the Defendants decided to take disciplinary action. After considering the ineffectiveness of their previous counseling sessions, the Defendants imposed a three-day suspension.
 
 
 23
 The Defendants were aware of the dispute over the exact words of Sims' statement at the time they imposed discipline. After investigating the incident, they decided to accept the newspaper version. Significantly, Sims does not contend that the Defendants deprived him of procedural due process during their investigation of his conduct and imposition of discipline. The law does not require omniscience of the Defendants in their investigation of employee conduct; it requires only that their investigation be thorough enough to support a reasonable person's conclusion that action based thereon would not violate clearly established law. Because Sims alleges no shortcomings with respect to the Defendants' investigation, the constitutionality of their decision to impose discipline must be measured against the version of Sims' statements upon which they relied.
 
 2. The Cause of Sims' Suspension
 
 24
 Sims next contends that there exists a genuine issue of material fact with respect to the cause of his three-day suspension. He asserts that, although the Defendants claim that they suspended him for all of his prior misconduct, they, in fact, suspended him solely for his December 16, 1990 sermon. This dispute, according to Sims, presents a genuine issue of material fact.
 
 
 25
 Although the Defendants note Sims' prior actions and statements, they candidly admit that this latest disciplinary action arose solely from Sims' December 16, 1990 statements. It is apparent that the Defendants considered the prior actions and statements only to determine the severity of the appropriate sanction, which is not an issue in this case. No factual dispute, material or otherwise, exists. The disciplinary action arose from Sims' December 16, 1990 statements.
 
 
 26
 3. The Racially Divisive Nature of Sims' Statements
 
 
 27
 Sims next contends that there is a dispute about the nature of his statements. He contends that the statements should not have been considered racially or ethnically divisive, derogatory, or insulting. The resolution of this case, however, does not depend upon whether the statements should have been considered racially divisive, derogatory, or insulting. It depends only upon whether an objectively reasonable official could believe that the statements were inflammatory. We conclude that a reasonable person could find the statements inflammatory, as the defendants did.[3]
 
 
 28
 4. The Impact of Sims' Remarks upon His Ability to
 
 
 29
 Contribute to the Fulfillment of the Department's Mission
 
 
 30
 Sims next contends that there is a dispute about whether the statements diminished his ability to perform his job. The relevant question, however, is not whether the statements, in fact, diminished Sims' ability to perform his job, but whether a reasonable official might think, as the Defendants thought, that the statements diminished both Sims' and the Department's credibility among members of the Hispanic community. We conclude that a reasonable official could believe that the statements diminished Sims' ability to perform his job and the Department's ability to accomplish its purpose.
 
 
 31
 5. The Cause of the Furor Among Members of the Hispanic Community
 
 
 32
 Sims finally contends that there is a dispute over the cause of the furor in the Hispanic community. He contends that the furor arose from the misreported version of his remarks. The actual cause of the furor in the Hispanic community, however, bears little relevance to the constitutionality of the Defendants' imposition of discipline. The key is whether a reasonable person in the Defendants' positions could have believed, as the Defendants believed, that Sims' remarks infuriated members of the Hispanic community. We conclude that such a reasonable person could have held such a belief.
 
 C.
 
 33
 Having concluded that no genuine issues of material fact exist, this court must address the merits of the qualified immunity issue. The doctrine of qualified immunity arises from the need to afford public officials some measure of protection from personal liability in their performance of discretionary duties. Cf. Gregoire v. Biddle, 177 F.2d 579, 581 (2d Cir.1949) (discussing the need for official immunity), cert. denied, 339 U.S. 949, 70 S.Ct. 803, 94 L.Ed. 1363 (1950). The Supreme Court frequently has considered the exact scope of the protection that should be afforded state officials whose duties require the exercise of discretion. See Scheuer v. Rhodes, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); Harlow, 457 U.S. at 800, 102 S.Ct. at 2727; Anderson v. Creighton, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); Seigert v. Gilley, --- U.S. ----, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991). The current doctrine covers the state official's discretionary actions with the cloak of qualified immunity so long as the official's actions do not violate clearly established rights of which a reasonable person would have known. See Harlow, 457 U.S. at 817-18, 102 S.Ct. at 2737-38. This standard requires a two-step analysis to determine whether qualified immunity entitles an official to summary judgment. We must determine (1) whether the official established that he or she acted within the scope of discretionary authority when the allegedly wrongful acts occurred, and (2) whether the plaintiff demonstrated that the official's actions violated clearly established rights. See Davis v. Locke, 936 F.2d 1208, 1213 (11th Cir.1991).
 
 
 34
 1. The Scope of the Defendants' Discretionary Authority
 
 
 35
 Sims concedes that the Defendants were acting within the scope of their discretionary authority. The A.C.L.U., however, contends that the Defendants acted outside the scope of their discretionary authority when they disciplined Sims. It submits that, because Sims alleges that he was punished for exercising his First Amendment rights, that allegation necessarily implies that the Defendants acted beyond the scope of their discretionary authority. Stated differently, the A.C.L.U. contends that any time a government official violates clearly established law he acts beyond the scope of his discretionary authority.
 
 
 36
 The A.C.L.U.'s position is untenable. It merely equates the question of whether the defendants acted lawfully with the question of whether they acted within the scope of their discretion. The issues are distinct.
 
 
 37
 "A government official proves that he acted within the purview of his discretionary authority by showing 'objective circumstances which would compel the conclusion that his actions were undertaken pursuant to the performance of his duties and within the scope of his authority.' " Hutton, 919 F.2d at 1537 (quoting Rich, 841 F.2d at 1564). As supervisory employees of the Department, the Defendants' duties included the consideration of complaints about the conduct of Department employees, such as Sims, and the administration of discipline, when appropriate. There is no contention that the three-day suspension imposed upon Sims exceeded the scope of the Defendants' authority to administer disciplinary measures. The Defendants successfully established that they acted within the scope of their discretionary authority.
 
 2. Sims' Clearly Established Rights
 
 38
 The dispositive question, then, becomes whether a reasonable person would have concluded that the Defendants' actions violated Sims' clearly established rights under the First Amendment. Sims contends that the First Amendment protects his right to make the remarks he made from the pulpit. The issue, however, is whether the First Amendment protects from disciplinary action Sims' interest in government employment. It is clear that the First Amendment does not provide a right to continued government employment in a capacity that is inconsistent with, and undermined by, one's off-duty expressive conduct. Cf. L. Tribe, American Constitutional Law § 12-26 at 1018 (2d ed.) ("[T]hose associational rights that are demonstrably incompatible with the mission of a given public agency or calling may be forbidden--not on a theory that public servants lose their constitutional rights when they assume government duty, but on a theory that such rights cannot be defined independent of the contexts in which they are asserted."). Stated more simply, one who cheers for the robbers has no right to ride with the police. Rankin v. McPherson, 83 U.S. 378, 394, 107 S.Ct. 2891, 2902, 97 L.Ed.2d 315, 330 (1987) (Scalia, J., dissenting).
 
 
 39
 The Supreme Court previously has considered the scope of First Amendment protection provided to public employees' interest in public employment. This court has summarized the Supreme Court's seminal Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), holding as follows:
 
 
 40
 A determination whether a public employer has improperly sanctioned an employee on the basis of the employee's speech requires "a balance between the interest of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."
 
 
 41
 Kurtz v. Vickrey, 855 F.2d 723, 726 (11th Cir.1988) (quoting Pickering, 391 U.S. at 568, 88 S.Ct. at 1734-35); see also Connick v. Myers, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). This court also has recognized the difficult position of the public employer, which must decide whether to take disciplinary action without the aid of a bright-line standard to measure the constitutionality of its conduct. "Because no bright line standard puts the reasonable public employer on notice of a constitutional violation, the employer is entitled to immunity except in the extraordinary case where Pickering balancing would lead to the inevitable conclusion that the discharge of the employee was unlawful." Dartland v. Metropolitan Dade County, 866 F.2d 1321, 1323 (11th Cir.1989).
 
 
 42
 a. Sims' Interest in His Statements
 
 
 43
 "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." Connick, 461 U.S. at 147-48, 103 S.Ct. at 1690. The Defendants concede that Sims' statements related to matters of public concern. Sims made his statements from the pulpit, during the course of a sermon. Sims' statements, made in the context of the City's refusal to honor Nelson Mandela, regarding the consequent Black boycott of certain businesses and the impropriety of speaking Spanish in public establishments, address matters of public concern in Miami.
 
 
 44
 b. The Department's Interest, as an Employer, in Promoting
 
 
 45
 the Efficiency of Its Services
 
 
 46
 Our conclusion that Sims' remarks addressed matters of public concern, however, does not dispose of the qualified immunity issue. Only if Sims' interest in his homiletics clearly outweighs the Department's interest can Sims' claim survive the Defendants' motion for summary judgment based on qualified immunity. This court views the nature of Sims' employment with the Department as crucial to the determination of the balance. It must, therefore, consider the Department's interest in disciplining Sims for his speech. Pertinent considerations include whether Sims' statements impede the performance of the speaker's duties or interfere with the regular operation of the enterprise. See Rankin, 483 U.S. at 388, 107 S.Ct. at 2899.
 
 
 47
 [I]n weighing the State's interest in [disciplining] an employee based on any claim that the content of a statement made by the employee somehow undermines the mission of the public employer, some attention must be paid to the responsibilities of the employee within the agency. The burden of caution employees bear with respect to the words they speak will vary with the extent of authority and public accountability the employee's role entails. Where ... an employee serves no confidential, policy-making, or public contact role, the danger to the agency's successful functioning from that employee's private speech is minimal.
 
 
 48
 Id. at 390-91, 107 S.Ct. at 2900. Conversely, when the employee serves in a sensitive capacity that requires extensive public contact, the employee's private speech may pose a substantial danger to the agency's successful functioning.
 
 
 49
 The Department has a compelling interest in the accomplishment of its missionthe avoidance of urban violence by fostering understanding and tolerance among all of Miami's ethnic groups. Additionally, Sims serves in a sensitive capacity that requires extensive public contact, and his statements pose a substantial danger to the Department's successful accomplishment of its mission. Sims admits that his position requires him to move through the community to build rapport, to ease mounting pressures before they erupt into violence, and to provide access to the County government. Furthermore, although the amount of Spanish spoken in public places may offend Sims, members of Miami's Hispanic community might justifiably object to efforts to curb the use of Spanish in public places. Curbs on the use of Spanish would force many Spanish-speaking Miamians to contend with the same sort of language barrier that Sims bemoans. Members of the Hispanic community understandably would be loathe to discuss their disputes and grievances with a Department whose employees have publicly noted their opposition to the use of Spanish in public places.
 
 
 50
 The Department apparently believes that the avoidance of the racial and cultural resentment and the resulting riots that have plagued Miami requires a Department that maintains its credibility among all of the constituent groups of multi-ethnic Miami. The Department's core purpose is to foster harmony among all of the different segments of Miami's diverse community. Sims' statements, by alienating some segments of Miami's community, undermine the Department's ability to accomplish that purpose. The First Amendment does not require that Sims be allowed to continue his weekday employment drenching the fires of racial animosity for the Department while he fans those flames during his weekend sermons.
 
 
 51
 This court emphasizes that it is only the particular nature of Sims' job, the mission of the Department, and the inconsistency therewith of Sims' statements that place Sims' complaint beyond the protective scope of the First Amendment.
 
 III. CONCLUSION
 
 52
 For the foregoing reasons, we REVERSE the district court's denial of the motions of the individual-capacity defendants, Avino, Sosa, and Major, for summary judgment based on qualified immunity. We REMAND this case to the district court for resolution of the other claims asserted by Sims.
 
 HATCHETT, Circuit Judge, dissenting:
 
 53
 I respectfully dissent. The district court properly considered the county officials' qualified immunity based summary judgment motion and did not err in denying it without prejudice.
 
 
 54
 The majority approaches this case as though the determinative factor is what Sims said. Obviously, under the Pickering balancing test, what Sims said is not as important as is the effect of what he said. It is difficult to understand how the majority, without a fact record, can determine the effects of Sims's statements on the Department and on his ability to serve the Department. Not one bit of evidence is referred to in the majority opinion on this subject. No such evidence is referred to in the majority opinion because it does not exist. The district court correctly ruled that it would decide the qualified immunity issue once facts were developed. From that ruling springs a majority opinion, based not on the effects of the public employee's statements, but on the employee's job title and the statement the employee made. Such an analysis is heretofore unknown to First Amendment jurisprudence. Under the majority's new employer-employee-political-speech rule, cases will be easy. The majority says: consider the employee's job title and the statement; if the statement is inconsistent with the job title the speech is not protected. After this majority opinion, public employees in the Eleventh Circuit may only engage in political speech which the employer approves of, even if no evidence indicates that the speech harmed the employer's mission. Controversial speech is now presumed to be harmful to the employer's mission.I. FACTUAL MATTERS
 
 
 55
 After an all white jury acquitted several Metro Dade police officers of charges stemming from the brutal beating and death of an African-American insurance executive, Arthur McDuffie, members of Dade County's African-American community took to the streets to express their outrage through violence and destruction, which has become known as "the McDuffie riot." Shortly after the McDuffie riot, Metropolitan Dade County hired Willie Sims, an African-American community leader, to work in the Dade County Department of Community affairs (the Department). The Department placed Sims on the crisis prevention and response team and charged him with identifying and cooling down anger in the African-American community. Generally, the Department's principal function was to investigate the concerns of the community's various ethnic and racial groups and to take steps to ease the tension among such groups. The Community Relations Board (CRB) is comprised of volunteers the Dade County Commission appoints and has a principal function similar to that of the Department and works in conjunction with the Department. Because the county hired Sims in 1980 as a community relations specialist, he has been working with the CRB.
 
 
 56
 In 1984, the Department promoted Sims to the position of crisis prevention and response coordinator where he served as a liaison between the African-American community and the government. Sims was highly effective during the turbulent 1980s, a time in which Dade County experienced four riots resulting from the acquittal of officers charged with fatally shooting or beating African-Americans. For his work in the African-American community, Sims received an award from the United States Department of Justice.
 
 
 57
 After the Department promoted Sims to the position of coordinator of the crisis prevention and response team, the New Hope Missionary Baptist Church ordained him as a minister. Sims helped organize a new church, the Greater New Faith Missionary Baptist Church, under the parent New Hope Missionary Baptist Church and became pastor of the newly organized church. In his role as pastor, Sims gave sermons and ministered to the needs of his congregation addressing all the problems the church members faced in their daily lives, including political issues. This wide scope of concerns is traditional in African-American church activities.
 
 
 58
 In November of 1990, Ali Sosa as the Director of the Department, and the assistant director, Lloyd Major, moved Sims to the Office of Black Affairs, a less visible position in the county government, because his position on several issues affecting African-Americans had made him controversial in other Dade County communities. In this new position, Sims was expected to express the views of the African-American community.
 
 
 59
 On December 16, 1990, Sims delivered a sermon at his church concerning the city of Miami's refusal to officially welcome Nelson Mandela, the great hero of anti-apartheid in South Africa. The controversy over the city's treatment of Nelson Mandela prompted the African-American community to boycott stores in Miami which did not show sensitivity towards African-Americans. In his sermon, Sims stated:
 
 
 60
 We are now entering the second phase of the boycott known as 'Rediscovering Black America.' You should not spend your money with any business that does not hire blacks or who have not shown any sensitivity towards us in the past and you should support black businesses or those who have a history of hiring blacks. Sometimes we are made to feel like foreigners in our own homeland because of the way Spanish is spoken in many of our public facilities and businesses, such as restaurants that we frequent.
 
 
 61
 A newspaper reporter who was in attendance at Sims's church reported that Sims had called for African-American citizens to stop doing business with white and Hispanic establishments.[1] As a result of this report, leaders of Dade County's Hispanic community swiftly rebuked Sims. The County Manager, Joaquin Avino, learned of the controversy and directed Sosa to investigate the matter and to take disciplinary action if necessary.
 
 
 62
 Sosa and Major met with Sims to discuss the incident. At the meeting, Sims disagreed with the media's characterization of his statements and insisted that the statements made from the pulpit of his church, while acting in his capacity as a pastor, were beyond the concern of any of his county supervisors, regardless of their content. Sims also made it clear at the meeting that he would not tolerate limitations upon his off-duty speech, especially speech made in connection with his role as a minister.[2] Sosa and Major assumed that the media's account of Sims's statements was accurate and suspended Sims for three days to impress upon him their belief that his statements detracted from the credibility of the Department and adversely affected his ability to perform his job.
 
 II. PROCEDURAL HISTORY
 
 63
 Pursuant to 42 U.S.C. § 1983, Sims filed an action for damages, alleging that Metropolitan Dade County and several of its officials violated his First and Fourteenth Amendment rights. Avino, Sosa, and Major, as individual defendants, moved for summary judgment based on qualified immunity. The district court denied the motion for summary judgment without prejudice to the individual defendants' right to reassert the defense of qualified immunity at the trial of the cause.
 
 III. DISCUSSION
 
 64
 Avino, Sosa, and Major (collectively "the county officials") contend that the district court erred when, instead of resolving their qualified immunity based summary judgment motion, it denied the motion "without prejudice to the individual defendants' right to reassert a defense of qualified immunity at the trial of this cause." Specifically, the county officials contend that their entitlement to qualified immunity must be resolved before trial, and if possible before discovery is permitted. In Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the Supreme Court held that "government officials generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow, 457 U.S. at 818, 102 S.Ct. at 2738.
 
 A. The Proper Time for Qualified Immunity
 
 65
 The Supreme Court created the doctrine of qualified immunity to "avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment." Harlow, 457 U.S. at 818, 102 S.Ct. at 2738. In order to ensure that insubstantial claims were decided at the summary judgment phase, the Supreme Court held in Mitchell v. Forsyth, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985) that "a district court's denial of a claim of qualified immunity to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment." Mitchell, 472 U.S. at 530, 105 S.Ct. at 2817. The Supreme Court noted in Mitchell that the entitlement of qualified immunity "is an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." Mitchell, 472 U.S. at 526, 105 S.Ct. at 2815.
 
 
 66
 In Ansley v. Heinrich, 925 F.2d 1339 (11th Cir.1991), this court followed the Supreme Court's "immunity from suit" rationale in holding that
 
 
 67
 qualified immunity is a question of law that may be asserted in three ways: (1) on a pretrial motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim; (2) as an affirmative defense in the request for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c); or (3) on a summary judgment motion pursuant to Federal Rule of Civil Procedure 56(e). All three motions precede the trial and require the district court to rule as a matter of law, whether the official is entitled to the defense of qualified immunity.
 
 
 68
 Ansley, 925 F.2d at 1347 (citations omitted.) This court concluded in Ansley that "[t]he Supreme Court's qualified immunity precedent aims at one goal: to keep the public official out of the courtroom, free to exercise discretionary duties under clearly established law without the constant threats of lawsuits." Ansley, 925 F.2d at 1345.
 
 
 69
 If public officials lose at the summary judgment phase, they lose their entitlement not to stand trial. Public officials, however, do not necessarily lose their entitlement to be immune from liability. See Hamm v. Powell, 874 F.2d 766, 770-71 (11th Cir.1989), aff'd on reh'g, 893 F.2d 293 (11th Cir.1990). Although the district court should decide the legal issue of qualified immunity before trial, the district court can, of course, correct or modify its summary judgment ruling for error of law during the trial on a directed verdict motion or after the trial on a motion for judgment notwithstanding the verdict. See Zimmern v. United States, 298 U.S. 167, 169-70, 56 S.Ct. 706, 706-07, 80 L.Ed. 1118 (1936).
 
 
 70
 Unresolved factual issues may also prevent the district court from disposing of the qualified immunity claim at the summary judgment phase. In such a situation, the district court may allow the ultimate finder of facts to resolve conflicting versions of the facts through the use of special interrogatories. See Warren v. Dwyer, 906 F.2d 70, 76 (2d Cir.1990). Qualified immunity, however, cannot be argued to the jury as a defense to liability. See Ansley, 925 F.2d at 1347-48. Thus, qualified immunity is more related to whether a public official must stand trial than whether the public official may successfully defend against the plaintiff's claims.
 
 
 71
 In this case, the district court correctly considered the qualified immunity claim before trial. The district court's order suggests that the resolution of the defense was thwarted because of a factual dispute which can be resolved through further discovery or the submission of the different factual versions to the ultimate finder of facts. The district court correctly reasoned that after further factual development, the county officials in this case may still be entitled to qualified immunity during the trial on a directed verdict motion, or after the trial on a motion for judgment notwithstanding the verdict.
 
 B. The Defense of Qualified Immunity
 
 72
 The county officials contend that they are entitled to summary judgment on the basis of qualified immunity. This court has held that in order to demonstrate that summary judgment is warranted on the basis of qualified immunity, a public official must "establish both that he is entitled to summary judgment as a matter of law ... and that there are no genuine issues of material fact pertinent to those questions of law." Rich v. Dollar, 841 F.2d 1558, 1562 (11th Cir.1988). In Hutton v. Strickland, 919 F.2d 1531 (11th Cir.1990), this court held that "the presence of genuine issues concerning material facts relating to the implicated legal issue indicates that the district court properly denied summary judgment and that we are without jurisdiction because the case must be tried for resolution of the factual questions." Hutton, 919 F.2d at 136 (citing Hudgins v. City of Ashburn, Georgia, 890 F.2d 396, 403 (11th Cir.1989)).
 
 1. Genuine Issues of Material Fact
 
 73
 In this case, the county officials are not entitled to summary judgment based on qualified immunity because a genuine issue of material fact exists concerning whether Sims's statements impaired his ability to carry out his duties as a liaison for the Black Affairs Unit. The majority wrongly limits the relevant inquiry to whether a reasonable official might think that Sims's statements diminished both his and the Department's credibility among members of the Hispanic community. Based on this limited inquiry, the majority concludes that a genuine issue of material fact did not exist as to whether a reasonable official could believe that the statements diminished Sims's ability to perform his job and the Department's ability to accomplish its purpose. The majority's limited inquiry, however, ignores the dynamics of Miami's multi-ethnic community and misapprehends the nature of Sims's duties.
 
 
 74
 The majority fails to realize that at the time Sims made the statements in question he was no longer the coordinator for the crisis response team which attempted to foster mutual understanding among all ethnic groups and acted as a conciliator in disputes among the various ethnic communities. At the time Sims made his statements, he had been assigned to the Office of Black Affairs under the Department's Division of Community Relations. The Department's Community Relations Division also contained an Office of Latin Affairs and an Office of Handicapped Opportunities. Sims's new responsibilities in the Office of Black Affairs consisted primarily of providing a vehicle that would allow the African-American community to access Dade County government in order to voice opinions and concerns over issues affecting the African-American community. Sims's new position relieved him of the responsibility of attempting to foster a mutual understanding among all ethnic groups and limited his responsibility to dealing with the African-American community.[3]
 
 
 75
 Sims contends that his statements enhanced his ability to perform his job in that they preserved his credibility in the African-American community. Sims pointed out to the county officials that in order to serve as a liaison between the African-American community and the Dade County government, he had to maintain his credibility as a leader in the African-American community and actively represent the concerns of African-Americans. Additionally, Sims noted that in maintaining his credibility with the African-American community, sometimes he would be called upon to address controversial issues and express opinions in which other ethnic communities did not concur.[4] Thus, Sims argues that without respect and admiration in the African-American community, he cannot effectively function as a liaison between the African-American community and the Dade County government.
 
 
 76
 Sims also contends that his statements were not in conflict with the primary mission of the Department of Community Affairs. Specifically, Sims contends that his statements quite properly addressed the issues and concerns affecting the African-American community, served to identify public concerns within that community, and directly addressed community issues and problems within the Dade County community as a whole.
 
 
 77
 The majority wrongly focuses on the Hispanic community instead of considering the dynamics of Miami's multi-ethnic community. The majority fails to realize that the Department must deal with the concerns of all segments of the community in order to foster mutual understanding and tolerance among all of Dade County's ethnic groups. Additionally, the majority misapprehends the nature of Sims's job and what allows him to effectively perform his duties. Sims established a genuine issue of material fact upon which a question of law must turn, and thus, the district court correctly denied the county officials' motion for summary judgment based on qualified immunity. See Hutton, 919 F.2d at 1536. This court is without jurisdiction because the case must be tried for resolution of the factual questions. See Hutton, 919 F.2d at 1536.
 
 2. Assuming the Plaintiff's Facts
 
 78
 For purposes of qualified immunity, the county officials may take the position that Sims's allegations are true in order to eliminate the genuine issue of material fact. In other words, the county officials may assume that Sims's statements did not adversely affect his ability to perform his duties nor adversely affect the Department's mission in fostering mutual understanding between the ethnic groups in Miami. The county officials may allow the court to consider in the light most favorable to Sims all facts fairly inferable from the record, regardless of the existence of factual disputes, and decide whether, under those facts, their conduct violated the law clearly established at the time. See Bennett v. Parker, 898 F.2d 1530, 1535 n. 2 (11th Cir.1990) (Tjoflat, C.J., concurring).
 
 3. The Qualified Immunity Standard
 
 79
 The Supreme Court has held that qualified immunity affords protection to "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986). In applying the standard for qualified immunity, this court must "conduct its review through the eyes of an objective, reasonable government official." Nicholson v. Georgia Dept. of Human Resources, 918 F.2d 145, 147 (11th Cir.1990). In Nicholson, we held that the relevant inquiry is "could a reasonable official have believed his or her action to be lawful in light of clearly established law and the information possessed by the official at the time the conduct occurred." Nicholson, 918 F.2d at 147. The Supreme Court refined its objective standard for qualified immunity in Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987), by defining the term "clearly established" as used in the language of Harlow. The Supreme Court stated that
 
 
 80
 [t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of preexisting law, the unlawfulness must be apparent.
 
 
 81
 Anderson, 483 U.S. at 640, 107 S.Ct. at 3039 (citations omitted). In accord with Anderson, this court has stated that
 
 
 82
 the plaintiff must draw the court's attention to a more particularized and fact specific inquiry. Under this inquiry, the plaintiff need not point to one or more cases that resolve the precise factual issues at issue in his or her case. Although the standard is fact specific, it is not one of factual rigidity.
 
 
 83
 Nicholson, 918 F.2d at 147 (citations omitted). The Supreme Court's holding in Anderson, adopted in Nicholson, strikes a balance between unnecessarily burdening officials with the responsibility of divining the meaning of general constitutional and statutory terms and unreasonably failing to assess liability unless the specific action has been found unlawful. See Anderson, 483 U.S. at 639-40, 107 S.Ct. at 3038-39. Public officials are required to relate established law to analogous factual settings. See People of Three Mile Island v. Nuclear Regulatory Commissioners, 747 F.2d 139, 144 (3d Cir.1984).
 
 
 84
 The objective standard for qualified immunity is to be applied through the use of the following two-part analysis:
 
 
 85
 (1) the defendant public official must first prove that 'he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.'
 
 
 86
 (2) Once the defendant public official satisfies his burden of moving forth with the evidence, the burden shifts to the plaintiff to show lack of good faith on the defendant's part. This burden is met by proof demonstrating that the defendant public official's actions 'violated clearly established constitutional laws.'
 
 
 87
 Rich v. Dollar, 841 F.2d 1558, 1563-64 (11th Cir.1988) (quoting Zeigler v. Jackson, 716 F.2d 847, 849 (11th Cir.1983) (per curiam)). After establishing the two-prong objective test for qualified immunity, this court noted in Rich that the second prong of the test poses two questions of law which must be answered: (1) What was the clearly established law at the time of the public official's actions, and (2) whether the public official's conduct violated that clearly established law. Rich, 841 F.2d at 1564. In order to determine whether, at the time of this incident, Sims had a clearly established right not to be suspended for his off-duty speech, the court must look to the established law in the area. See Greason v. Kemp, 891 F.2d 829, 833 (11th Cir.1990).
 
 
 88
 a. The Scope of Discretionary Authority
 
 
 89
 In applying an objective standard to the county officials' conduct of suspending Sims, this court must determine initially if the county officials acted within the scope of their discretionary authority. We noted in Rich that "a government official can prove he acted within the scope of his discretionary authority by showing 'objective circumstances which would compel the conclusion that his actions were undertaken pursuant to the performance of his duties and within the scope of his authority.' " Rich, 841 F.2d at 1564 (quoting Barker v. Norman, 651 F.2d 1107, 1121 (5th Cir. Unit A 1981)). The county officials were clearly acting within the scope of their discretionary authority because the county officials' duties included considering complaints about the conduct of employees under their supervision and administering discipline to those employees when appropriate. The county officials' action of suspending Sims for his off-duty speech was undertaken pursuant to their duty of disciplining employees and was thus within the scope of their discretionary authority.
 
 
 90
 b. Lack of Good Faith
 
 
 91
 This court must next apply the second part of the Rich analysis in order to determine if the county officials are entitled to qualified immunity. We must determine whether Sims has established that the county officials' action of suspending him for three days lacked good faith because the actions violated clearly established First Amendment law. See Rich, 841 F.2d at 1563-64. In applying the second part of the Rich analysis, we begin with determining the clearly established law.
 
 
 92
 (1) Clearly Established First Amendment Law
 
 
 93
 In Connick v. Myers, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), the Supreme Court held that "it has been settled that a state cannot condition public employment on a basis that infringes the employees' constitutionally protected interest in freedom of expression." Connick, 461 U.S. at 142, 103 S.Ct. at 1687. The Supreme Court did note, however, that this protection is not absolute because "the state has interest as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." Pickering v. Board of Education, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968). In Pickering, the Supreme Court held that courts must "arrive at a balance between the interest of the [public official], as a citizen, in commenting upon matters of public concern and the interest of the state, as an employer, in promoting the efficiency of the public services it performs through its employees." Pickering, 391 U.S. at 568, 88 S.Ct. at 1734-35; see Rankin v. McPherson, 483 U.S. 378, 383, 107 S.Ct. 2891, 2896, 97 L.Ed.2d 315 (1978). The Supreme Court noted in Rankin that "vigilance is necessary to ensure that public employers do not use authority over employees to silence discourse, not because it hampers public functions but simply because superiors disagree with the content of employees' speech." Rankin, 483 U.S. at 384, 107 S.Ct. at 2897.
 
 
 94
 The Supreme Court also noted in Rankin that "the threshold question in applying [the Pickering] balancing test is whether [Sim's] speech may be 'fairly characterized as constituting speech on a matter of public concern.' " Rankin, 483 U.S. at 384, 107 S.Ct. at 2897 (quoting Connick, 461 U.S. at 146, 103 S.Ct. at 1689). The majority correctly recognized that Sims's statements addressed a matter of public concern. Sims's statements addressed the African-American community's boycott of businesses in the Miami area. Sims's speech invited the unfettered interchange of ideas and was part of an attempt to bring about political and social changes which the people desired, and thus addressed a matter of public concern. See Roth v. United States, 354 U.S. 476, 484, 77 S.Ct. 1304, 1308-09, 1 L.Ed.2d 1498 (1957); see also Connick, 461 U.S. at 145, 103 S.Ct. at 1689.
 
 
 95
 The Supreme Court noted in Rankin that after a court establishes the threshold issue that the speech in question is a matter of public concern,
 
 
 96
 the statement [or speech] will not be considered in a vacuum; the manner, time, and place of the employee's expression are relevant, as is the context in which the dispute arose.... pertinent considerations [are] whether the statement impairs discipline by superiors or harmony among coworkers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise.
 
 
 97
 Rankin, 483 U.S. at 388, 107 S.Ct. at 2899 (citations omitted). The Supreme Court did not announce a general standard against which employee speech is to be judged, and thus, this court must balance these competing interests on a case-by-case basis. See Dartland v. Metropolitan Dade County, 866 F.2d 1321 (11th Cir.1989). We must determine, in light of Pickering, Connick, and Rankin, whether a reasonable county official could have believed that his or her actions were lawful.
 
 
 98
 (2) Violating the Clearly Established Law
 
 
 99
 In Maples v. Martin, 858 F.2d 1546 (11th Cir.1988), this court held that after a court has determined that an employee's speech can be fairly characterized as implicating a matter of public concern, the plaintiff employee must demonstrate that "the speech was a 'substantial or motivating factor' in the employment decision. Maples, 858 F.2d at 1552. Additionally, this court held that "when both these showings have been made, the court will apply the balancing test set out in Pickering ... to determine 'whether the adverse employment decision was justified.' Maples, 858 F.2d at 1552 (quoting Ferrara v. Mills, 781 F.2d 1508, 1512 (11th Cir.1986)). In addition to admitting that Sims's speech addressed matters of public concern, the county officials admit that Sims's speech was a "substantial or motivating factor" in their decision to suspend him for three days. Thus, this court can apply the balancing test set out in Pickering. See Maples, 858 F.2d at 1552.
 
 
 100
 In Dartland v. Metropolitan Dade County, 866 F.2d 1321 (11th Cir.1989), this court set out the test for determining whether a reasonable public official's actions were lawful in light of Pickering and its progeny. In Dartland, the court stated:
 
 
 101
 [b]ecause no bright-line standard puts the reasonable public employer on notice of a constitutional violation, the employer is entitled to immunity except in the extraordinary case where Pickering balancing would lead to the inevitable conclusion that the discharge of the employee was unlawful.
 
 
 102
 Dartland, 866 F.2d at 1323. We need not decide the precise result of applying the Pickering balancing test in this case, because the Pickering balance must lead to the inevitable conclusion that the county official's action of suspending Sims for his off-duty speech was unlawful. Dartland, 866 F.2d at 1324. Thus, this court must decide only whether the result of such a balancing would be so clearly in favor of protecting Sims's right to speak that reasonable officials in the county officials' position would necessarily know that suspending Sims for engaging in his speech violated Sims's constitutional rights. Dartland, 866 F.2d at 1324; see also Busby v. City of Orlando, 931 F.2d 764, 774 (11th Cir.1991). On Sims's side of the Pickering scale is his interest in making statements which represent "the unfettered interchange of ideas for the bringing about of political and social changes desired by the people"--a type of speech occupying the highest rung of the hierarchy of First Amendment values. See Roth v. United States, 354 U.S. 476, 484, 77 S.Ct. 1304, 1308-09, 1 L.Ed.2d 1498 (1957); see also Connick, 461 U.S. at 145, 103 S.Ct. at 1689.
 
 
 103
 The manner, time, and place of Sims's speech also greatly tips the Pickering balancing scale in his favor. Sims's speech was made from the pulpit of his church during a Sunday morning sermon before his congregation of African-American citizens. In his role as pastor of the church, Sims delivered his sermon to inform his congregation about matters affecting their daily lives.
 
 
 104
 On the county officials' side of the Pickering scale is their interest in promoting the efficiency of the public services their offices perform through their employees. See Pickering, 391 U.S. at 568, 88 S.Ct. at 1734-35. The county officials, however, have failed to demonstrate that Sims's speech adversely affected this important interest. Assuming the facts as Sims has alleged them for purposes of the county officials' qualified immunity based summary judgment motion, Sims's speech did not adversely affect the ability of the county officials to discipline subordinates, nor did his speech disturb the harmony among co-workers. Additionally, under the facts as Sims has alleged them, his speech did not impede the performance of his duties nor adversely affect the Department's mission of fostering mutual understanding between ethnic groups in Miami. As noted earlier, Sims submitted evidence that his statements enhanced his ability to perform his job and enhanced the Department's goal of maintaining open lines of communication in order to be fair and responsive to all members of the community. For purposes of evaluating the qualified immunity based summary judgment motion, this evidence stands uncontradicted.
 
 
 105
 Under Pickering, it is clear that the county officials' action of suspending Sims for engaging in constitutionally protected speech violated clearly established First Amendment law. Reasonable public officials in the county officials' position could not have believed that in light of the holdings and rationale of Pickering, and Connick, and Rankin, suspending Sims under the facts he alleged did not violate the First Amendment. Thus, the county officials are not entitled to summary judgment on the basis of qualified immunity.
 
 IV. CONCLUSION
 
 106
 In this case, the district court correctly reasoned that after further factual development, the county officials may still be entitled to qualified immunity during the trial on a directed verdict motion or after the trial on a motion for judgment notwithstanding the verdict. The district court also correctly considered the county officials' qualified immunity based summary judgment motion and did not err in denying the motion without prejudice. Additionally, the district court properly reasoned that the county officials are not entitled to summary judgment based on qualified immunity because a genuine issue of material fact exists concerning whether Sims's statements impaired his ability to carry out his duties as a liaison for the Black Affairs Unit and the Department's ability to provide its services to the county's multi-ethnic community. Assuming the facts as Sims alleged them for the purposes of qualified immunity, the county officials' actions violated clearly established law and they are not entitled to qualified immunity.
 
 
 
 *
 Honorable Bailey Brown, Senior U.S. Circuit Judge for the Sixth Circuit, sitting by designation
 
 
 [1]
 Sims contends that the El Nuevo Herald misquoted him. It reported the version of Sims' remarks that the Defendants now assert
 
 
 [2]
 Although Sims mentions his freedom of religion, he makes no religion-based arguments. This court, therefore, does not consider any free-exercise-based arguments
 
 
 [3]
 We note that Sims contends only that the statements were not, in fact, inflammatory. We would face a different question if Sims contended that the Defendants did not believe that the statements were inflammatory
 
 
 [1]
 No claim is made that Sims initiated the boycott
 
 
 [2]
 The district court ruling is not based on these claims
 
 
 [3]
 I would not be dissenting in this case if I could bring the majority to the realization that Sims, at the time of the sermon, was not in the "peace-making" role he formerly occupied. The record makes this absolutely clear
 
 
 [4]
 To emphasize this fact, Sims pointed out that while he coordinated the crisis response team, sometimes members of the African-American community did not perceive him as representing their interests. As an example, Sims points to a rally at a Miami Church where leaders of the African-American community met to oppose the appointment of a person as superintendent of the Dade County School Board. Sims notes that he and a member of the U.S. Department of Justice Community Relations Service, were attacked verbally at this meeting because of their positions. Members of the African-American community questioned, "Who the hell are you Uncle Toms representing here? If you are here as a representative of an agency, we want to ask you to leave. If you are here as concerned blacks, you can remain. Are you a pastor today or are you a member of the Community Relations Board?"