Diane THORNTON, etc.,
et al., Plaintiffs,

v.

The CITY OF MONTGOMERY,
ALABAMA, et al.,
Defendants.

No. Civ.A. 98–T–1080–N.

United States District Court,
M.D. Alabama,
Northern Division.

Aug. 31, 1999.

Robert M. Shipman, Huntsville, AL, C. Wayne Morris, Huntsville, AL, for Diane Thornton, individually, Dorothy Raab, individually as wife of James Robert Raab, deceased, and as Personal Representative of the Estate of James Robert Raab, deceased, plaintiffs.

George B. Azar, Elizabeth C. Wible, Azar & Azar, Montgomery, AL, F. Tim McCollum, City Attorney, Montgomery, AL, for The City of Montgomery, Alabama, John Wilson, Albert D. Allen, Edward McCurdy, Mary E. Buce, Janice

Hopkins, Terrance D. Smith, Michael E. Minger, Alvin R. Hendricks, Laura Addison, Lucille Moore, defendants.

Marvin Whitted, Millbrook, AL, for Marvin Whitted, in his official capacity as a City of Montgomery employee at the time of the death of James Raab, defendant pro se.

## MEMORANDUM OPINION

MYRON H. THOMPSON, District Judge.

Plaintiffs Diane Thornton (the daughter of James Robert Raab, deceased) and Dorothy Raab (Raab's widow and the representative of his estate) have brought this lawsuit in federal court claiming that Raab died while a pre-trial detainee in the Montgomery City Jail because jail staff failed to supervise him properly. The plaintiffs have named the City of Montgomery, Alabama, its Police Chief, and much of the city's jail staff as defendants. The plaintiffs base their lawsuit on the following: 42 U.S.C.A. § 1985 (civil rights conspiracy statute); 42 U.S.C.A. § 1986 (neglect or refusal to prevent conspiracy under § 1985); the United States Constitution as enforced through 42 U.S.C.A. § 1983; and 42 U.S.C.A. § 1988 (attorneys' fees). They also assert a 'wrongful death' state-law claim. The plaintiffs seek compensatory and punitive damages, and they have properly invoked the jurisdiction of the court pursuant to 28 U.S.C.A. § 1331 (federal-question), 28 U.S.C.A. § 1343(a)(4) (civil rights), and 28 U.S.C.A. § 1367(a) (supplemental).

Currently, this lawsuit is before the court on the defendants' motion for summary judgment. The defendants rely on, among other things, the grounds that the plaintiffs' evidence is insufficient to establish a violation of federal law and that the defendants are protected by 'qualified immunity.' For the reasons that follow, summary judgment will be granted on the federal claims, and the state-law claim will be dismissed without prejudice.

## I. SUMMARY–JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Once the party seeking summary judgment has informed the court of the basis for its motion, the burden shifts to the non-moving party to demonstrate why summary judgment would be inappropriate. See Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); see also Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115–17 (11th Cir.1993) (discussing how the responsibilities on the movant and the nonmovant vary depending on whether the legal issues, as to which the facts in question pertain, are ones on which the movant or nonmovant bears the burden of proof at trial). In making its determination, the court must view all evidence and any factual inferences in the light most favorable to the nonmoving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

## II. BACKGROUND

On October 27, 1997, while imprisoned in the Montgomery City Jail, Raab died from asphyxiation. A spoon was found lodged in his throat. The plaintiffs filed this lawsuit on September 23, 1998. The facts, as garnered with some difficulty from the record and viewed in the light most favorable to the plaintiffs, are as follows:

### A.

Raab was a Navy veteran. In 1972, he received a medical discharge due to his severe psychiatric problems. Subsequently, Raab was diagnosed as a paranoid schizophrenic and periodically hospitalized. At the time of his death, he was receiving medicines for his mental health problems from a Veteran's Administration Hospital.

Montgomery City Police Officers periodically arrested Raab for disorderly conduct

and harassment. Raab's disruptive behavior usually consisted of "preaching the Bible" on or near business premises. He had also been arrested for driving without a license.

*October 23, 1997:* A Montgomery City Police Officer arrested Raab for disorderly conduct at a gasoline station in Montgomery, Alabama. Raab had been pestering business customers for food and loudly quoting passages from scripture. During his arrest and transportation to the prison, Raab claimed the police and jail personnel were out to kill him, that he was going to die, and that he would stop breathing in his sleep.[1]

When booked into the Montgomery City Jail by Warden Edward McCurdy, Raab continued his Bible talk and repeated his claim that he was going to die.[2] Corrections Officer Marvin Whitted was unable to fingerprint Raab because of his uncooperative behavior.[3] Corrections Supervisor Clete Davis instructed jailers to strip-search Raab, provide him with jail-issue clothes, and place him in a cell reserved for inmates with mental-health problems.[4] Because Raab's behavior, including his fear of death, was essentially the same as his behavior on prior occasions, he was essentially treated in the same manner as he had been treated on earlier occasions.

*October 24:* Raab was taken to the court holding area to await his initial appearance before a judge. However, after repeatedly flushing the toilet, making noise and otherwise disturbing other pretrial detainees, he was removed at the request of the bailiff.[5] Raab's sister maintains that, sometime between October 24 and 26, she told the Montgomery Police Department that Raab needed his medicines.[6] Furthermore, Raab had his medicine for high blood pressure confiscated from him on his arrest. He refused that medicine on October 24 and 25.[7]

*October 25 and 26:* Between 11:30 p.m. on October 25, and 7:00 a.m. on October 26, Corrections Supervisor Janice H. Hopkins twice observed Raab in his cell and, at 5:30 a.m. on October 26, attempted to give him some medicine.[8] At approximately 9:30 a.m., Officer Whitted responded to a report that Raab had soiled himself and removed Raab's clothes to have them cleaned. Whitted brought Raab his lunch, and also visited him after lunch.[9] At 2:45 p.m., another corrections officer observed Raab, sitting naked on his bed. Raab's sister attempted to visit him at 3:00 p.m., but Raab refused to put on any clothes, so the officers refused to let her see him. Corrections Officer Alvin R. Hendricks last saw Raab at feeding time, which was between 4:30 and 5:00 p.m.[10] Another corrections officer observed Raab on three occasions between 3:00 and 7:00 p.m. and once more between 7:00 p.m. and 8:00 p.m. Raab appeared to be alive on each occasion.[11] At 6:30 p.m. Timothy Dubose, a

1. Plaintiffs' responses, filed on June 9, 29, and 30 and July 14, 1999, to defendants' motion for summary judgment, exh. 5 (Alabama Bureau of Investigation Report, handwritten statement of Officer Gonzalez, dated October 23, 1997, at 54–55).

2. *Id.* (handwritten statement of Clete L. Davis, dated September 29, 1997, at 61–62).

3. *Id.* (handwritten statement of Marvin Whitted, dated November 12, 1997, at 92).

4. *Id.*

5. *Id.* (handwritten statement of Edward McCurdy, dated September 28, 1997, at 59).

6. *Id.* (handwritten statement of Norma Jeanne Macon, dated November 6, 1997, at 87–88).

7. *Id.* (memorandum from Nurse J.A. Vason to Warden M.E. Buce, dated October 31, 1997, at 68).

8. *Id.* (memorandum from J.H. Hopkins to Warden M.E. Buce, dated November 7, 1997, at 91).

9. *Id.* (memorandum from Officer M. Whitted to ABI inspector John Johnson, dated October 31, 1997, at 94).

10. *Id.* (voluntary statement of Alvin Hendricks, dated October 27, 1997, at 46–48).

11. *Id.* (handwritten statement of Travis L. Green, dated November 13, 1997, at 96–98).

fellow inmate, had observed Raab moving in his cell.[12] Later that evening, at about 10:30 p.m., Otis Boggs, another inmate, heard Raab talking to himself in his cell.[13] Corrections Officer Kwaku McNabb looked in on Raab at about the same time.[14]

*October 27:* Corrections Officer Terrence D. Smith made checks on Raab, by looking into his cell on October 27, at 12:36 a.m. and 1:38 a.m. He checked other cells in the block at 2:00 a.m., 2:19 a.m., 2:47 a.m. and 3:21 a.m., but did not look into Raab's cell.[15] Hendricks also checked the cell block, but not Raab's cell, at 12:14 a.m., 1:03 a.m., and 1:31 a.m.[16] Inmate Dubose stated that he saw Raab at 3:45 a.m., but did not see Raab breathing. At 4:14 a.m., Smith opened Raab's door as part of the wake-up procedures, but did not look in. He discovered Raab was dead at 4:46 a.m.[17]

### B.

The Montgomery City Jail has written policies for dealing with prisoners who are mentally ill or need some form of treatment. The jail's treatment policy entitles "[a]ny inmate … to [the] medical care necessary to conserve his health … He is also entitled to the services of a competent doctor and … to prompt admission to a hospital when necessary."[18] Its mental health policy provides that,

"Security cells will be used for the confinement of mentally ill inmates. Remove every item from the inmate and cell that might possibly be used for self-destruction. Provide close supervision and surveillance if necessary.

"The mental tank, 2D, will be used for confinement of mentally ill inmates requiring restraint. Management of violent mentally ill inmates will be referred to the jail physician, who can prescribe sedation as needed to control the patient and prevent injury to himself or others. " … The name of each such inmate, along with the case history if known, will be brought to the attention of the Jail Warden for necessary action. Make an entry in the diary and call Mental Health."[19]

Montgomery City Police Chief John Wilson stated[20] that the jail also has unwritten procedures, and that "the warden in the jail is responsible for recommending the policy in the jail and any updates they wrote."[21] The following unwritten policies applied to Raab's treatment in the jail: (1) The jail transferred important information about inmates from one shift to the next using a "shift-briefing sheet," which listed the inmates detained in Cell-block 2 and the reason for putting them there.[22] (2) "Jail personnel were not required to summon a physician for an inmate unless he or she was 'violent' and in need of sedation to prevent self-harm or harm to others."[23]

12. *Id.* (voluntary statement of Timothy Dubose, dated October 27, 1997, at 32–33).

13. *Id.* (handwritten statement of Otis Boggs, dated October 27, 1997, at 26); *see also id.* (voluntary statement of Otis Boggs, dated October 27, 1997, at 27–28).

14. *Id.* (handwritten statement of Kwaku S. McNabb, dated November 4, 1997, at 83).

15. *Id.* (handwritten statement of Terrence D. Smith, dated November 3, 1997, at 73–75).

16. *Id.* (handwritten statement of Alvin R. Hendricks, dated November 4, 1997, at 80–81).

17. *Id.* (handwritten statement of Terrence D. Smith, dated November 3, 1997, at 73–75).

18. *Id.* (Rules of Conduct of Montgomery City Jail, at 290).

19. *Id.* (at 293).

20. *See* Defendants' evidence, filed April 2, June 11, and July 2 and 19, 1999, in support of motion for summary judgment (affidavit of John H. Wilson, dated April 1, 1999, ¶ 9); *id.* (transcript of deposition of John H. Wilson, dated May 6, 1999, at 10:6–15).

21. *Id.* (at 17:10–12).

22. *Id.* (affidavit of Edward McCurdy, dated March 30, 1999, ¶ 17).

23. *Id.* (¶ 18). "At no time during Raab's October 1997 incarceration did his conduct rise to a level that would have required restraint and sedation. Raab's conduct could only be described as rowdy, uncooperative, peculiar, strange, or difficult, *not* violent. Raab's conduct was not unlike the vast majority of the Jail's mentally ill inmates." *Id.*

If, at time of booking, jail personnel is aware that a person is, or appears to be, mentally ill, they do not directly call health services to request an evaluation for the inmate. Instead, the Montgomery Municipal Court bailiff does so. A request for mental health evaluation must be made "within 24 hours of booking, unless the inmate is booked on a weekend, in which case an evaluation will be requested the following Monday." [24]

The Montgomery City Jail has at least two unwritten policies applicable to inmate medicines:

"[1] When family members make requests regarding medical treatment for an inmate or bring an inmate's medicine to the Jail, a Jail nurse will take the steps are [sic] necessary to try to obtain the requested medical treatment and administer prescription medications. Calls to doctors and hospitals about prescriptions are generally made during business hours." [25]

"[2] The Jail does not require inmates to take medication simply because it is prescribed to them." [26]

Finally, the jail has the following written policy concerning suicides:

"Usually the inmate contemplating suicide will exhibit certain clues in his behavior. These may include sleeplessness, loss of appetite, withdrawal from contacts with others, a depressed and hopeless attitude, or even threats of suicide. All jail employees must be alert to these symptoms.

"When any jail employee has reason to believe that a prisoner is suicide risk, he will immediately notify the officer in charge, who will then arrange for full-time surveillance and supervision.

"Security cells will be used for the confinement of prisoners displaying suicidal tendencies. All personal items that could possibly be used in any such attempt will be removed from the possession of the prisoner. Exchange jail clothing for any item of personal clothing that could be used for such purpose. Thoroughly search the cell prior to confinement of the prisoner. *Keep him under surveillance.*" [27]

## C.

As stated, the plaintiffs have sued a host of persons connected with the Montgomery City Jail. They are as follows:

● *Montgomery City Police Chief John Wilson:* He drafted and recommended the jail policies.

● *Montgomery City Jail Warden Edward McCurdy:* He booked Raab into the jail and heard his suicide threat.

● *Assistant Warden Mary E. Buce:* She was off-duty during Raab's incarceration. However, she remained on-call as a supervisor.

● *Corrections Supervisor Albert D. Allen:* He was on duty on October 23 and 26, 1997, and knew Raab from prior incarcerations. Though he knew Raab was in cell 2–B, he did not check the log for this cell.

● *Corrections Supervisor Clete Davis:* He was on duty on October 23 and 26, 1997, and knew Raab from prior incarcerations. He heard Raab threaten suicide at booking-in. Raab's family told Davis that Raab required an injection and oral medicine, both of which were available from a Veterans Administration Hospital, but Davis did not make any notation of Raab's illness or inform anyone of the medicine required.

● *Corrections Supervisor Janice H. Hopkins:* She was on duty on October 23, 1997, knew Raab from prior incar-

---

**24.** *Id.* (¶ 19). "The Mental Health evaluation process often takes a week or more, and even then, other facilities may not be able immediately to take a mentally-ill inmate." *Id.* (¶ 21).

**25.** *Id.* (¶ 26).

**26.** *Id.* (¶ 28).

**27.** Plaintiffs' responses, filed on June 9, 29, and 30 and July 14, 1999, to defendants' motion for summary judgment, exh. 5 (Rules of Conduct of Montgomery City Jail, at 292).

cerations, and heard him threaten suicide. She knew Raab was in cell 2–B, checked on him twice, and attempted to give him some medicine, which he refused. She reported this refusal.

- *Nurse Lucille Moore:* She was on duty on October 23, 1997. She prepared the medicine to be administered to Raab, though she did not administer it herself. She had no direct contact with Raab,[28] though she was aware that he did not take his blood-pressure medicine.

- *Corrections Officer Laura Addison:* She was on duty on October 24–26, 1997. From 7:00 a.m. on October 25 and all October 26, she was assigned to other areas of the jail.[29]

- *Corrections Officer Alvin R. Hendricks:* He was on duty on October 24–26, 1997. He knew Raab was in cell 2B, and checked on him eleven times on October 24, six times on October 25, and four times on October 26, though he did not look through Raab's cell window; nor did he note Raab's behavior in the log.

- *Corrections Officer Michael E. Minger:* He was on duty on October 23–October 26, 1997, and knew Raab from prior incarcerations. He knew Raab was in cell 2–B, that he had to be removed from a court holding area for fighting with other inmates, and that he twice refused food trays.

- *Corrections Officer Terrence D. Smith:* He was off-duty October 23–26, 1997. He started work on October 27, 1997, at 10:30 p.m. He knew Raab was in cell 2–B because of Raab's mental problems. Though the log shows Smith checked on Raab eleven times, Raab was dead on eight of those occasions.

- *Corrections Officer Marvin Whitted:* He was on duty on October 23–October 26, 1997, and knew Raab from prior incarcerations. He knew Raab was in cell 2B and heard Raab threatened suicide. Whitted checked on Raab on October 25, 1997, and, because Raab was "acting out," did not trust him to clean his own cell. On October 26, 1997, Whitted checked Raab seven times. On one occasion he found Raab naked, urinating, with his clothes torn and his jumpsuit soiled. Whitted left Raab naked and sent his clothes to be cleaned. He later left a food tray in Raab's cell and forgot to retrieve it. However, the food tray and spoon were still in cell 2B when Raab was found dead.

## III.  DISCUSSION

### A.  Federal Claims

#### 1.  Section 1983

■  The plaintiffs' complaint, as amended, is rambling and unclear. It has therefore not been an easy task to divine the legal basis of their claims from their complaint and the other documents they have submitted to the court. The plaintiffs use broad and vague descriptions of the sources of law upon which they base their claims, and, as result, the court cannot be completely sure of what legal theories they actually seek to advance. To be sure, the plaintiffs rely on § 1983, but § 1983 does not create any rights of its own, and rather simply allows for redress of violations of other rights. *See Baker v. McCollan,* 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689, 2694 n. 3, 61 L.Ed.2d 433 (1979). In identifying the rights they seek to assert, the plaintiffs make only this broad statement: Raab "had his civil rights violated and his rights guaranteed under the Constitution of the United states ... violated by the Defendants acting under the color of law." This statement, of course, leaves considerable territory open for consideration, and the plaintiffs never once attempt to narrow it.

---

**28.**  Defendants' evidence, filed April 2, June 11, and July 2 and 19, 1999, in support of motion for summary judgment (affidavit of Lucille Moore, dated February 8, 1999, ¶¶ 3–4).

**29.**  *Id.* (affidavit of Laura Addison, dated February 12, 1999, ¶ 6).

Nevertheless, the court does the best it can with what it has been provided.

From an examination of the complaint and documents, the court concludes that the basis of the plaintiffs' federal claims is the 'substantive' portion of the due process clause of the fourteenth amendment as enforced by § 1983. The court reaches this conclusion for several reasons. First, the plaintiffs assert claims against only officials acting under color of state law. Second, although the fourteenth amendment provides for an array of rights other than substantive due process—including certain privileges and immunities, the right to equal protection, and the right to 'procedural' due process—there is no evidence before the court to suggest that there has been a violation of these other rights. Third, the plaintiffs may not rely on the eighth amendment's prohibition on cruel and unusual punishment because it applies only after a conviction of a crime, *see Whitley v. Albers,* 475 U.S. 312, 318, 106 S.Ct. 1078, 1083–84, 89 L.Ed.2d 251 (1986); *Ingraham v. Wright,* 430 U.S. 651, 664, 97 S.Ct. 1401, 1408–09, 51 L.Ed.2d 711 (1977), and, here, Raab had not been convicted of a crime at the time of his detention and death. But, fourth and most importantly, it is apparent from the plaintiffs' complaint, when considered as a whole, that the trust of their claims is a 'substantive' due process challenge to the circumstances that led to Raab's death. The Eleventh Circuit Court of Appeals has made clear that, in a case in which a pretrial detainee seeks to prevail on a charge that jail officials failed to provide adequate mental health treatment in violation of § 1983, the detainee must show a violation of 'substantive' due process, that is, that the officials acted with 'deliberate indifference' to his mental condition. *See Tittle v. Jefferson County Commission,* 10 F.3d 1535, 1539 (11th Cir.1994) (en banc). With this preliminary conclusion, the court now turns to the question whether the plaintiffs can prevail on this substantive-due-process claim.

The plaintiffs name a municipality and 12 city officials (11 jail officials and the chief of police) as defendants. The city officials are sued in both their 'individual' and 'official' capacities. The city officials, to the extent they have been sued in their individual capacities for violating § 1983, have raised the affirmative defense of 'qualified immunity.'

■■■ The doctrine of qualified immunity insulates government agents against personal liability for money damages for actions taken in good faith pursuant to their discretionary authority. *See Harlow v. Fitzgerald,* 457 U.S. 800, 807, 102 S.Ct. 2727, 2732, 73 L.Ed.2d 396 (1982). As established by the United States Supreme Court in *Harlow,* the test for 'good faith' or qualified immunity turns primarily on the objective reasonableness of the officials' conduct in light of established law: "governmental officials … generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." 457 U.S. at 818, 102 S.Ct. at 2738. Where the law that the defendants allegedly violated was not clearly established at the time of the alleged offense, the defendants are entitled to qualified immunity. *See id.* at 807, 102 S.Ct. at 2732. If the law was clearly established, however, the immunity defense will fail since "a reasonably competent public official should know the law governing his conduct." *Id.* at 818, 102 S.Ct. at 2738.

■ The Eleventh Circuit follows a two-step analysis in determining whether a public official is entitled to qualified immunity. *See Sims v. Metropolitan Dade County,* 972 F.2d 1230, 1236 (11th Cir. 1992). First, the defendant must prove that he was acting within the scope of his 'discretionary authority' at the time of the allegedly illegal conduct. *See id.* Once this is shown, the burden shifts to the plaintiff to prove that the defendant's actions violated clearly established statutory or constitutional law. *See id.* Here, it is unquestioned that defendant city officials

were acting within the scope of their discretionary authority at the time of the allegedly illegal conduct. Thus, the sole question is whether the officials' actions violated clearly established statutory or constitutional law.

In a recent opinion, a unanimous Supreme Court stated that, "A court evaluating a claim of qualified immunity 'must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation.'" *Wilson v. Layne*, 526 U.S. 603, ——, 119 S.Ct. 1692, 1697, 143 L.Ed.2d 818 (1999) (quoting *Conn v. Gabbert*, 526 U.S. 286, ——, 119 S.Ct. 1292, 1295, 143 L.Ed.2d 399, (1999)). "Deciding the constitutional question before addressing the qualified immunity question," the Court continued, "promotes clarity in the legal standards for official conduct, to the benefit of both the officers and the general public." *Id.*[30]

This approach is an important counterbalance to the "nonconstitutional doctrine[ ]" of qualified immunity which "regularly prove[s] decisive in limiting the ability of lower federal courts to redress constitutional violations, [and] in shutting the doors of the courthouse to ordinary people." Stephen Reinhardt, *The Anatomy of an Execution: Fairness vs. "Process"*, 74 N.Y.U.L.Rev. 313, 317 (1999). Thus, although the approach contradicts "the generally sound rule of avoiding determination of constitutional issues," it allows clarification of standards of official conduct which would otherwise "tend to remain uncertain, to the detriment both of officials and individuals." *County of Sacramento v. Lewis*, 523 U.S. 833, ——, n. 5, 118 S.Ct. 1708, 1714 n. 5, 140 L.Ed.2d 1043 (1998).

■ If the court determines that the plaintiff has not alleged a deprivation of a constitutional right, then the inquiry is over, for it would follow perforce that such right was not clearly established. *See id.* However, if the court determines that the plaintiff has, in fact, alleged a deprivation of a constitutional right, then further inquiry is needed as to "whether that right allegedly implicated was clearly established at the time of the events in question," *id.*, and, of course, the violation of the clearly established right must be self-evident from the evidence put forward by the plaintiff in her opposition to summary judgment. *See Rich v. Dollar*, 841 F.2d 1558, 1564 (11th Cir.1988). This court will therefore first determine whether a constitutional right was violated before considering whether that right was clearly established.

As stated, § 1983 permits an individual to obtain legal redress for a violation of his constitutional rights by a state actor; it is not, by itself, a source of substantive federal rights. *See Baker v. McCollan*, 443 U.S. at 144 n. 3, 99 S.Ct. at 2694 n. 3. To sustain a claim under § 1983, a plaintiff must allege facts showing that the "conduct complained of was committed by a person;" that the person was "acting under color of state law;" and that "this conduct deprived [the plaintiff] of rights, privileges or immunities secured by the Constitution or laws of the United States." *Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 1913, 68 L.Ed.2d 420 (1981). Here, the city officials are persons, and they were without a doubt acting under color of state law at the time of the events in question. Therefore, the disputed question is whether their conduct violated the laws of the United States.

■ As stated, the plaintiffs here must show that defendant jail officials displayed

---

**30.** The court in *Santamorena v. Georgia Military College*, 147 F.3d 1337, 1343 n. 14 (11th Cir.1998), clung to the approach that a court may pass directly to the "clearly established" prong of the qualified immunity determination without first pausing to determine wheth-

er a constitutional right has been violated. However, the Supreme Court in *Layne* directs that a court should typically first reach the constitutional issue, then proceed to an immunity determination.

'deliberate indifference' to Raab's mental condition. The initial legal question for the court is what constitutes 'deliberate indifference.' 'Deliberate indifference' requires that an individual "know[ ] of and disregard[ ] an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S.Ct. 1970, 1979, 128 L.Ed.2d 811 (1994). In other words, "the official must *both* be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* (emphasis added). Thus, "deliberate indifference describes a state of mind more blameworthy than negligence," *id.* at 835, 114 S.Ct. at 1978; it "requires 'more than ordinary lack of due care for the prisoner's interests or safety.'" *Id.* (quoting *Whitley v. Albers*, 475 U.S. 312, 319, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986)).

Moreover, if the charge is that a jail official unconstitutionally failed to prevent a suicide, "deliberate indifference can … be established [only] where a plaintiff demonstrates a "'strong likelihood, rather than a mere possibility,'" that suicide would result from a defendant's actions or inaction," *Tittle*, 10 F.3d at 1540 (quoting *Edwards v. Gilbert*, 867 F.2d 1271, 1276 (11th Cir.1989)); "the mere opportunity for suicide, without more, is clearly insufficient to impose liability on those charged with the care of prisoners." *Tittle*, 10 F.3d at 1540. Deliberate indifference in the case of a suicide is therefore "a difficult burden for a plaintiff to meet." *Popham v. City of Talladega*, 908 F.2d 1561, 1563 (11th Cir.1990) (per curiam).

■ Here, it appears that Raab's death resulted not from suicide but rather from an accident—albeit an accident that was proximately caused by his mental illness. The plaintiffs' own evidence establishes that, at the time of his admission to the city jail, Raab probably lacked the mental capacity to form the intent to kill himself.[31] *Cf. Southern Life & Health Ins. Co. v. Wynn*, 29 Ala.App. 207, 194 So. 421, 422

(1940) (suicide traditionally requires, as one of its elements, that the person committing suicide intend to take his or her own life). In other words, Raab ingested the spoon probably without the intent to kill himself. In any event, whether Raab committed suicide or he accidentally killed himself because of his mental illness, the plaintiffs have failed to show the required deliberate indifference.

The plaintiffs allege a range of acts for which different defendants may be culpable. These acts may be broken down into two broad groups: failure-to-do acts by *supervisory staff* who, for the most part, had no direct contact with Raab; and failure-to-do acts by *subordinates* who had direct contact with Raab.

### A. Supervisory Staff

The plaintiffs charge that Warden McCurdy and Police Chief Wilson are responsible in their individual capacities for their failure to hire and adequately train capable jail personnel, and that Warden McCurdy and Officers Wilson, Allen, Davis, and Buce are liable in their individual capacities because they did not adequately supervise potentially suicidal prisoners. Chief Wilson drafts and recommends policies to the Mayor of the City of Montgomery, and Warden McCurdy is responsible for the operation of the Montgomery City Jail.

■ Supervisory personnel cannot be held liable under § 1983 for the actions of their subordinates under a theory of respondeat superior. *See Monell v. Department of Social Servs.*, 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978); *Greason v. Kemp*, 891 F.2d 829, 836 (11th Cir.1990). Instead, the plaintiffs must show that Chief Wilson, Warden McCurdy, and the others personally participated in, instigated, or adpoted the acts comprising the alleged constitutional violation or that a "causal connection" links their policies or decisions with the violation. *Hill v.*

---

31. Plaintiffs' responses, filed on June 9, 29, and 30 and July 14, 1999, to defendants' motion for summary judgment, exh. 6 (affidavit of Kris Sperry, dated April 23, 1999, ¶ 6).

**1228**

*Dekalb Reg'l Youth Detention Ctr.*, 40 F.3d 1176, 1192 (11th Cir.1994). There, personal participation is established where a supervisor satisfies the following three criteria: (1) the failure to hire, train or supervise constitutes deliberate indifference; (2) "a reasonable person in the supervisor's position would understand that the [policy or decision] constituted deliberate indifference; and (3) . . . the supervisor's conduct was causally related to the subordinate's constitutional violation." *Adams v. Poag*, 61 F.3d 1537, 1544 (1995) (citing *Greason*, 891 F.2d at 837); *see Andrews v. Fowler*, 98 F.3d 1069, 1076 (8th Cir.1996) (applying criteria to failure-to-hire-competent-personnel claim).

*Failure–to–Supervise Claim:* Raab was not considered suicidal by the booking officers; he was instead treated under the jail's mental health policy. That policy does not explicitly treat all mentally ill inmates as suicide risks, although it requires officers to remove from a cell all objects that a mentally ill inmate might use to kill himself and requires officers to use security cells to confine mentally ill inmates. The mental health policy differs from the suicide policy, in part, because the latter mandates "full-time surveillance and supervision," whereas the mental health policy permits (though does not require) close visual inspection.

The plaintiffs' failure-to-supervise claim depends upon the theory that the mental health policy itself and the manner in which the jail's supervisory personnel enforced the policy constituted deliberate indifference to suicidal inmates and thus allowed someone like Raab to kill himself. It is, however, clear that defendants' handling of Raab under the mental health policy was no less diligent than it would have been under the suicide policy.

Although the mental health policy permitted, rather than required, visual inspection of mental inmates, inspection was performed in this instance. The uncontra-

dicted evidence establishes that the majority of the prison officers adequately handled Raab, and thus understood their duties under the policy. The only officers who failed to handle Raab properly were Hendricks and Whitted. Hendricks neglected to look through the cell window to confirm that Raab was safe, and Whitted failed to remove Raab's meal from his room. However, deliberate indifference is not established simply because inmates are not seen by jailers at all times. *See Popham*, 908 F.2d at 1565 (absence of surveillance for one shift did not establish deliberate indifference where other measures taken to prevent prisoner's suicide). Furthermore, it is apparent that the jail's mental health policy included replacing the normal metal trays and cutlery with styrofoam trays, plastic spoons, and juice cartons to reduce the potential for suicide.[32] These affirmative acts to reduce the likelihood of inmate self-harm are sufficient to demonstrate that the jail policies and the efforts by supervisory personnel to implement those policies did not constitute deliberate indifference. *See Tittle*, 10 F.3d at 1540. The plaintiffs have thus failed to establish that any defendants, in their supervisory capacity, violated Raab's constitutional rights.

*Failure–to–Train Claim:* The officials with responsibility to train jail officers were Chief Wilson and Warden McCurdy. Chief Wilson drafted and recommended written policy to the Mayor of Montgomery, and McCurdy implemented written policy, and supplemented or amended it with unwritten policies, in the Montgomery City Jail. The plaintiffs claim that the inability of particular jail officials to recall information gleaned from training videos and jail regulations establishes that defendants failed to train the jail personnel adequately.

The court has discussed the written provisions of the mental health policy relating

---

**32.** Defendants' evidence, filed April 2, June 11, and July 2 and 19, 1999, in support of motion for summary judgment (affidavit of Edward McCurdy, dated March 30, 1999, ¶ 15).

to supervision of inmates. The other requirements of the written mental health policy mandate jail officials to inform the warden of the name and case history of the inmate, to make a diary entry, and to call the mental health services. Unwritten policies include noting mentally ill inmates on a "shift-briefing sheet," requesting a mental health evaluation within 24 hours of booking, and delegating the duty to inform mental health services to the court bailiff.

In the instant case, it is clear that Warden McCurdy knew that Raab had been booked into the jail (the Warden was present at booking-in), that the court bailiff informed mental health services about Raab, that all objects which the officers thought Raab could use to kill himself were removed from his cell, that he was put in a secure call reserved for mentally ill inmates, and that he was put under some form of surveillance. That the policies promulgated by Chief Wilson and Warden McCurdy were adhered to indicates that the officers were adequately trained in those policies.

However, the court notes some areas of concern. First, the written policy affords prison officials wide discretion to determine what constitutes 'violent' behavior, and does not appear to give any guidance as to what the threshold for 'violence' is. In this case, the officers permitted Raab to bruise himself all over without adjudging him violent and without calling the prison physician. The physician is on call expressly to prevent mentally ill detainees from injuring themselves. In the physician's absence, Raab died. To prevent further fatalities, officers must be trained to recognize what level of violent and self-destructive behavior should trigger an evaluation by the jail physician. Nevertheless, the court cannot say that this failing would support the required conclusions that any of the defendants were deliberately indifferent to Raab's mental health needs *and* that this indifference led to his death.

Second, the jail's unwritten policy on medicines is that jail nurses shall take steps to obtain, from a doctor or hospital, whatever medicines are requested by an inmate's family. However, the jail does not force inmates to take medicines if they decline to do so. While it is clear that Moore and Hopkins followed the latter policy, it is far from clear that Davis,[33] or anyone else, was aware of or followed the former policy. To ensure the safety of mental inmates, the prison must establish a policy for recording family requests for medicines, and for ensuring that requested medicines are speedily obtained. Nevertheless, again the court cannot say that this failing would support the required conclusions that any of the defendants were deliberately indifferent to Raab's mental health needs *and* that this indifference led to his death.

*Failure–to–Hire Claim:* Finally, the plaintiffs allege that the defendants failed to hire capable jail personnel. First of all, it is by no means clear that any of the named defendants is responsible for hiring and firing jail officers. The court will however assume that Chief Wilson and Warden McCurdy are. Nevertheless, the plaintiffs' claim is limited to the contention that Davis was re-hired to work in the city jail despite his involvement in the death of Sanchez Cruz Loyolla, a prisoner, in 1997. However, the plaintiffs provide no evidence to suggest that the circumstances surrounding Loyolla's death were similar to those contributing to Raab's. Thus, there is no evidence that any decision to rehire Davis contributed to Raab's death.

### B. Subordinates

A defendant may be liable for his failure to oversee Raab only if he had a duty to oversee Raab and he was in a position to prevent his Raab's death. Raab was found dead at 4:46 a.m. on October 27, 1997,[34]

---

**33.** Raab's family maintains it informed Davis that Raab needed medicines from the Veterans Administration Hospital.

**34.** *Id.* (affidavit of Terence D. Smith, dated February 4, 1999, at ¶ 8).

and died sometime after midnight. The spoon which caused his death was lodged in his throat between twelve and 24 hours prior to his death.[35] It appears that the following people did not have any direct contact with him during the 24 hours before his death: Chief Wilson (had no contact with Raab); Warden McCurdy (had no contact with Raab); Buce (was off-duty during Raab's incarceration); Moore (did not administer medicine and had no direct contact with Raab); and Addison (worked on October 26 but was assigned to other areas of the jail).

Thus, the only defendants who were under a duty to inspect Raab and who were in a position to prevent his suicide were Officers Allen, Davis, Hendricks, Hopkins, Minger, Smith, and Whitted. There is no evidence that Allen, Davis, Hopkins, Minger and Smith were anything other than diligent in their checks on Raab. The court will thus focus its enquiry upon Hendricks and Whitted.

The court is deeply disturbed by officer Whitted's behavior. He allowed an obviously agitated, mentally-ill inmate to languish naked in his cell, and neglected to remove a food-tray from the cell. Such behavior should not be tolerated from an officer entrusted with prisoner's safety. However, though Whitted grossly neglected Raab's comfort and dignity, the plaintiffs have not adduced evidence to show that Whitted neglected Raab's safety. It appears that Whitted regularly checked on Raab. No evidence indicates that Whitted believed Raab could kill himself using the articles on his food tray. Thus, though Whitted's failure to remove the tray may have been negligent, it was not deliberately indifferent. *See Farmer v. Brennan,* 511 U.S. 825, 842, 114 S.Ct. 1970, 1981, 128 L.Ed.2d 811 (1994) (no deliberate indifference unless "the official acted or failed to act despite his knowledge of a substantial risk of serious harm.").

Hendricks's failure to check on Raab, though less of an affront to Raab's dignity, perhaps more seriously imperilled Raab's safety. However, there is no evidence that Hendricks was deliberately indifferent. First, Raab was listed as a mental-health risk, not a suicide risk. Hendricks was not on duty when Raab was booked-in, and there is no evidence that he heard Raab threaten suicide or was informed that Raab had threatened suicide. "Absent knowledge of a detainee's suicidal tendencies, the cases have consistently held that failure to prevent suicide has never been held to constitute deliberate indifference." *Popham,* 908 F.2d at 1564.

Furthermore, because Raab was listed as "mental," the court must evaluate Hendricks's behavior towards Raab under the jail's mental health policy, not its suicide policy. The mental health policy did not require the "full-time surveillance and supervision" mandated by the suicide policy. Instead, the policy permitted "close supervision and surveillance if necessary." While Hendricks did not personally look through the window of Raab's cell, he did periodically check on Raab. Thus, under the lesser level of surveillance required by the mental health policy, Hendricks's behavior, while apparently negligent, was not deliberately indifferent. *See Popham,* 908 F.2d at 1565.

The court has commented, above, about shortcomings in the jail's policy in obtaining and administering medicines. In particular, the plaintiffs allege that Raab's family informed Officer Davis that Raab required certain medicines which could be obtained from a Veterans Administration Hospital. However, the plaintiffs do not specify when Raab's family informed Davis that certain medicines were available and required.[36] The plaintiffs did not present evidence to show that Davis neglected to inform the jail nurse that Raab required

---

**35.** *Id.* (affidavit of James R. Laurisdon, dated March 31, 1999, at ¶ 8).

**36.** Plaintiffs' responses, filed on June 9, 29, and 30 and July 14, 1999, to defendants'

motion for summary judgment, exh. 10 (affidavit of Jeanne Raab Macon, dated May 18, 1999).

medicine. Thus, the plaintiffs have failed to state a claim against Davis for deliberate indifference to Raab's medical needs.

Because the plaintiffs have failed to demonstrate that jail personnel violated Raab's constitutional rights, summary judgment is due to be granted as to the individual defendants.

2.   Section–1985–and–1986 Claims

■   The plaintiffs bring claims under 42 U.S.C.A. §§ 1985 and 1986.[37] In order to state a claim for violations of these sections, the plaintiffs must allege the following: (1) a conspiracy by the defendants; (2) designed to deprive plaintiff of the equal protection of the laws; (3) the commission of an overt act in furtherance of that conspiracy; (4) a resultant injury to person or property or a deprivation of any right or privilege of citizens; and (5) defendants' actions were motivated by a racial or otherwise class-based invidiously discriminatory animus. *See Griffin v. Breckenridge,* 403 U.S. 88, 102–103, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971); *Lyes v. City of Riviera Beach,* 166 F.3d 1332, 1336–1337 (11th Cir.1999) (interpreting meaning of "class of persons" under § 1985) *Courtney v. Reeves,* 635 F.2d 326, 327 n. 1 (5th Cir. Unit A 1981) (claim under § 1986 premised upon the existence of a valid § 1985 claim).[38]

■   The plaintiffs do not argue that Raab's status as a pre-trial detainee makes him, without more, a member of a protected class. And the plaintiffs have failed to allege any facts that would show that the alleged conspirators were motivated by the racial or otherwise class-based discriminatory animus. The plaintiffs therefore may not survive summary judgment on their §§ 1985 and 1986 claims.

### 3.   Defendants in Their Official Capacities

■   To the extent the plaintiffs have sued the jail officials in their official capacities they have essentially sued the City of Montgomery. *See Kentucky v. Graham,* 473 U.S. 159, 166, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985) (Official-capacity lawsuits for damages are, "in all respects other than name, ... treated as a suit against the entity."). And to be sure, a plaintiff may sue a defendant in his official capacity, if such suit is not otherwise barred. But suing a defendant in such capacity is usually necessary only when a suit against the governmental entity itself is barred by the eleventh amendment to the United States Constitution. In such instances, a suit against governmental officeholders in their official capacities is the only effective way to bring the governmental entity into court and obtain relief. *See Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908) (holding that there is an exception to eleventh amendment immunity for actions seeking declaratory and injunctive relief against state officials for alleged violations of federal law). Here, however, there are no eleventh-amendment immunity issues presented. Therefore, while allowable, there is no need to

**37.**   Section 1985(3) provides that:

"If two or more persons in any State or Territory conspire ... for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws ... the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators."

Section 1986 provides that:

"Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented."

**38.**   In *Bonner v. Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit Court of Appeals adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

maintain suit against the city officials in their official capacities. Summary judgment will therefore be granted on the federal claims against the city officials in their official capacities, albeit without prejudice to the right to pursue these claims against the city itself.

### 4. City of Montgomery

■ A municipality may not be sued under § 1983 for the acts of others; it is responsible for only its own acts. *See Monell,* 436 U.S. at 691–694, 98 S.Ct. at 2036–2038; *City of St. Louis v. Praprotnik,* 485 U.S. 112, 123, 108 S.Ct. 915, 924, 99 L.Ed.2d 107 (1988) (plurality opinion). The plaintiffs may not succeed on a § 1983 claim against the City of Montgomery merely on the basis that the individual defendants were employed by the town. *See Monell,* 436 U.S. at 694, 98 S.Ct. at 2037; *see also Board of County Comm'rs of Bryan County v. Brown,* 520 U.S. 397, 403, 117 S.Ct. 1382, 1388, 137 L.Ed.2d 626 (1997) ("A municipality may not be held liable under § 1983 solely because it employs a tortfeasor.... We have consistently refused to hold municipalities liable under a theory of respondeat superior"). The plaintiffs must therefore establish that the city itself, through a government "policy or custom," caused the constitutional violation. *See Monell,* 436 U.S. at 694, 98 S.Ct. at 2037–2038.

■ The requirements of *Monell* cannot be satisfied simply by showing that a policy for which the city is responsible was flawed or inadequate. *See City of Oklahoma City v. Tuttle,* 471 U.S. 808, 823, 105 S.Ct. 2427, 2436, 85 L.Ed.2d 791 (1985); *see also Brown v. City of Elba,* 754 F.Supp. 1551, 1557 n. 17 (M.D.Ala.1990) (Thompson, J). Rather, the policy must

also represent " 'a deliberate choice to follow a course of action ... made from among various alternatives' by city policy makers." *Harris,* 489 U.S. at 391, 109 S.Ct. at 1205 (quoting *Pembaur v. City of Cincinnati,* 475 U.S. 469, 483–84, 106 S.Ct. 1292, 1300, 89 L.Ed.2d 452 (1986)). This means that when, as in this case, the plaintiffs challenge a city's policy of inaction or its failure to hire, train, or supervise capable officials, they must demonstrate that it "amount[ed] to deliberate . indifference to the rights of persons with whom the police come into contact." *Harris,* 489 U.S. at 388, 109 S.Ct. at 1204. As discussed, above, with regard to the individual defendants, the plaintiffs' evidence does not satisfy the "deliberate indifference" standard necessary to establish municipal liability. The plaintiffs' claims against the City of Montgomery therefore fail to survive summary judgment.

### B. State-law Claim

Because summary judgment will be granted on all of the plaintiffs' federal claims, the court declines to exercise supplemental jurisdiction over the plaintiffs' state-law claims, and, accordingly, will dismiss this claim, albeit without prejudice to the pursuit of the claim in state court. *See* 28 U.S.C.A. § 1367(c)(3).[39] *See also United Mine Workers of America v. Gibbs,* 383 U.S. 715, 726–727, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); *L.S.T., Inc. v. Crow,* 49 F.3d 679, 685 (11th Cir.1995).

### IV. CONCLUSION

Without question, Raab suffered an unfortunate fate in the Montgomery City Jail, and, admittedly, there is evidence that would arguably support the conclusion that

---

**39.** The dismissal without prejudice of the state-law claim should not work to the disadvantage of the plaintiffs. Section 1367(d) provides for at least a 30–day tolling of any applicable statute of limitations so as to allow a plaintiff to refile her claim in state court. The section states:

"(d) The period of limitations for any claim asserted under subsection (a), and for any

other claim in the same action that is voluntarily dismissed at the same time as or after the dismissal of the claim under subsection (a), shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period."

the defendants were reprehensibly negligent in some of the ways they handled this mentally ill person. Nevertheless, under the law of the United States Supreme Court and the Eleventh Circuit Court of Appeals, the defendants' overall conduct did not rise to a level that violated federal law. Therefore, the court holds that summary judgment will be granted on all of the plaintiffs' federal claims, and their state-law claim will be dismissed, albeit without prejudice. An appropriate judgment will be entered.